Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **vs.** | § | |
| | § | **CRIMINAL NO.** **4:24-cr-00302** |
| **(1) SHAWN NICHOLAS YOUNG,** | § | |
| **a/k/a James Show,** | § | |
| **a/k/a James Jones,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **(2) TRENIKIA LASHAE BANKS,** | § | |
| | § | |
| **Defendants.** | § | |

## CRIMINAL INDICTMENT

THE GRAND JURY CHARGES THAT:

## GENERAL ALLEGATIONS

At various times material to this Indictment:

### *The Defendants and Related Entities*

1.      Defendant **SHAWN NICHOLAS YOUNG** was a resident of Missouri City, Texas, within the Southern District of Texas.

2.      Defendant **TRENIKIA LASHAE BANKS** was a resident of Houston, Texas, within the Southern District of Texas.

### YOUNG's Business Entities

3.      Star Quality Janitorial Services Inc. ("SQ Janitorial") was registered as a Domestic For-Profit Corporation with the Texas Secretary of State on or about June 12, 2015. On or about June 9, 2016, the registration of SQ Janitorial was amended to delete the person named as the

original director of SQ Janitorial and to add **YOUNG** as director. SQ Janitorial was in tax forfeiture status between approximately February 2, 2018, and October 23, 2018.

4.      Star Quality Trucking Inc. ("SQ Trucking") was registered as a Domestic For-Profit Corporation with the Texas Secretary of State on or about November 22, 2016. **YOUNG** was listed as the initial registered agent and one of two directors.

5.      All Day Money Crew Entertainment LLC ("ADMC") was registered as a Domestic Limited Liability Company with the Texas Secretary of State on or about November 15, 2018. **YOUNG** was listed as the initial registered agent and managing member of ADMC. Below is the logo of ADMC.



**BANKS's Business Entities**

6.      The Exclusive Estates LLC was registered as a Domestic Limited Liability Company with the Texas Secretary of State on or about September 25, 2018. **BANKS** was listed as the initial registered agent and one of two governing members. The Exclusive Estates LLC was in tax forfeiture status between approximately February 28, 2020, and February 19, 2021.

7.      Solid LLC was registered as a Domestic Limited Liability Company with the Texas Secretary of State on or about January 16, 2020. **BANKS** was listed as the original registered agent and governing member.

8.      Impressionable Memories LLC was registered as a Domestic Limited Liability Company with the Texas Secretary of State on or about May 27, 2021. **BANKS** was listed as the initial registered agent and governing member. On or about March 10, 2023, the Texas Secretary of State entered a tax forfeiture on Impressionable Memories.

**Texas Workforce Commission: No Wages Reported**

9.      According to the Texas Workforce Commission, there were no wages associated with SQ Janitorial, SQ Trucking, ADMC, The Exclusive Estates LLC, Solid LLC, or Impressionable Memories LLC between at least January 1, 2019, and December 31, 2022.

### *The Small Business Administration and the CARES Act*

10.     The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

11.     On or about March 27, 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted to provide emergency financial assistance to the millions of Americans suffering adverse economic effects caused by the COVID-19 pandemic. The CARES Act established several new temporary programs and provided for expansion of others, including programs created and/or administered by the SBA. The CARES Act established the Paycheck Protection Program and enhanced the Economic Injury Disaster Loan Program.

### *The Paycheck Protection Program*

12.     One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a

program referred to as the Paycheck Protection Program ("PPP").   The PPP provided for government-backed loans designed to incentivize small businesses to keep their workers on the payroll by providing funds for up to 8 weeks of estimated payroll costs, including benefits.

13.     In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the applicant (through its authorized representative) was required to state, among other things: (a) its average monthly payroll expenses; and (b) its number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses. The applicant was also required to certify that the business was in operation on February 15, 2020, and had employees or paid independent contractors.

14.     A business's PPP loan application was received and processed, in the first instance, by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

15.     PPP loan proceeds were required to be used by the business on certain permissible expenses: payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses.

### *The Economic Injury Disaster Loan Program*

16.     The Economic Injury Disaster Loan ("EIDL") program is an SBA program that provides low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

17.     The CARES Act authorized the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses. The amount of the advance was determined by the number of employees the applicant reported under penalty of perjury. The advances did not have to be repaid.

18.     In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees on a given date corresponding to the disaster at issue, as well as gross revenue and cost of goods sold for the 12-month period preceding that date. In the case of EIDLs for COVID-19 relief, the given date was January 31, 2020, and the 12-month period was February 2019 through January 2020. The applicant was required to certify that the information in the application was true and correct to the best of the applicant's knowledge under the penalty of perjury.

19.     EIDL applications were submitted directly to the SBA and did not request a specific loan amount. If the SBA approved the application, it determined the amount of the loan based, in part, on the information in the application concerning the number of employees, gross revenue, and cost of goods. The SBA directly issued any funds it approved as an advance or as an EIDL. Applicants were permitted to use EIDL funds for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP funds.

### *Relevant Lending Institutions & Other Financial Institutions*

20.    The Federal Deposit Insurance Corporation ("FDIC") is an agency of the federal government which insures the deposits of member banks against loss with the purpose of preventing their collapse and instilling public confidence in the nation's banking institutions.

21.    Allegiance Bank was an FDIC-insured financial institution based in Texas.

22.    Cache Valley Bank was an FDIC-insured financial institution based in Utah.

23.    Hancock Whitney Bank was an FDIC-insured financial institution based in Mississippi.

24.    Allegiance Bank, Cache Valley Bank, and Hancock Whitney Bank were authorized by the SBA to participate as PPP lenders to small businesses.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

25.    The Grand Jury re-alleges paragraphs 1 through 24 of this Indictment.

26.    From in or around April 2020 through in or around September 2022, within the Southern District of Texas and elsewhere,

**SHAWN NICHOLAS YOUNG,**
**a/k/a James Show,**
**a/k/a James Jones,**

**and**

**TRENIKIA LASHAE BANKS,**

defendants herein, did knowingly and willfully combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, to commit certain offenses against the United States, namely: wire fraud, that is to knowingly devise and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme

and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

**All in violation of Title 18, United States Code, Section 1349.**

### *Overview of the Conspiracy and the Scheme to Defraud*

27.     During the conspiracy period alleged above, within the Southern District of Texas and elsewhere, the defendants conspired together and with others, and with intent to defraud, participated in a scheme and artifice to defraud the SBA, Allegiance Bank, Cache Valley Bank, and Hancock Whitney Bank, to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

28.     As part of the conspiracy, the defendants submitted, and caused to be submitted, false and fraudulent PPP and EIDL loan applications to the SBA, Allegiance Bank, Cache Valley Bank, and Hancock Whitney Bank, many of which were subsequently funded, as described below.

| Business Name (Owner) | Lender | Type of Loan | Approx. Loan Amount | Funded |
|---|---|---|---|---|
| SQ Trucking (**YOUNG**) | SBA | EIDL | $160,000 | No |
| SQ Janitorial (**YOUNG**) | SBA | EIDL | $160,000 | $10,000 Advance Only |
| ADMC (**YOUNG**) | SBA | EIDL | $160,000 | $10,000 Advance Only |
| SQ Trucking (**YOUNG**) | Allegiance Bank | 1st Draw PPP | $16,375 | Yes |
| ADMC (**YOUNG**) | Allegiance Bank | 1st Draw PPP | $88,540 | Yes |

| Business Name (Owner) | Lender | Type of Loan | Approx. Loan Amount | Funded |
|---|---|---|---|---|
| The Exclusive Estates LLC (**BANKS**) | SBA | EIDL | $150,000 | Yes |
| Solid LLC (**BANKS**) | SBA | EIDL | $150,000 | Yes |
| Impressionable Memories LLC (**BANKS**) | SBA | EIDL | $160,000 | No |
| SQ Janitorial (**YOUNG**) | Allegiance Bank | 1st Draw PPP | $135,416 | No |
| SQ Janitorial (**YOUNG**) | Cache Valley Bank | 1st Draw PPP | $135,000 | Yes |
| ADMC (**YOUNG**) | Cache Valley Bank | 2nd Draw PPP | $88,540 | Yes |
| SQ Janitorial (**YOUNG**) | Cache Valley Bank | 2nd Draw PPP | $135,000 | No |
| SQ Trucking (**YOUNG**) | Cache Valley Bank | 2nd Draw PPP | $124,690 | No |
| Impressionable Memories LLC (**BANKS**) | Cache Valley Bank | 1st Draw PPP | $121,250 | Yes |
| The Exclusive Estates LLC (**BANKS**) | Cache Valley Bank | 1st Draw PPP | $212,291 | No |
| SQ Trucking (**YOUNG**) | Hancock Whitney Bank | 2nd Draw PPP | $124,695 | Yes |

### ***Manner and Means of the Conspiracy and Scheme***

29.    It was part of the scheme that Defendants **SHAWN YOUNG**, **TRENIKIA BANKS**, and co-conspirators known and unknown to the Grand Jury would submit and cause to be submitted fraudulent PPP and EIDL loan applications to induce lenders to approve loans to

8

businesses that did not qualify to receive loans, or to induce lenders to approve loans in amounts above what businesses were entitled to receive.

     a.    Some fraudulent PPP and EIDL loan applications submitted by Defendants were for businesses with no existing operations, employees, and payroll. On the applications, Defendants would falsely represent that the businesses had employees and monthly payroll.

     b.    Some fraudulent PPP and EIDL loan applications submitted by Defendants were for businesses with existing operations, employees, and payroll. On the applications, Defendants would inflate the number of employees and monthly payroll of the businesses, to increase the loan amounts that the businesses would receive.

30.    It was part of the scheme that Defendants **SHAWN YOUNG, TRENIKIA BANKS,** and co-conspirators known and unknown to the Grand Jury would reinstate and cause the reinstatement of businesses that had entered tax forfeiture status with the Texas Secretary of State in order to apply for PPP and EIDL loans on behalf of those businesses.

31.    It was part of the scheme that Defendants **SHAWN YOUNG, TRENIKIA BANKS,** and co-conspirators known and unknown to the Grand Jury would submit and cause to be submitted fraudulent documents to substantiate their false statements to lenders regarding operations, number of employees, and monthly payroll of businesses seeking PPP and EIDL loans. These documents would include but are not limited to:

     a.    Fake personal tax returns showing Schedule C income from the businesses;

     b.    Fake business tax returns; and

     c.    Falsified letters from the Department of Treasury that had been altered to:

          i.    change the business names listed, to give the appearance that businesses had been assigned Employer Identifier Numbers ("EINs") when they had not, or

9

ii.    change the dates of EIN assignment from dates after February 2020 to dates before February 2020.

32.    It was part of the scheme that Defendant **SHAWN YOUNG** would submit to lenders fraudulent PPP and EIDL loan applications for businesses owned by Defendant **TRENIKIA BANKS** and other co-conspirators known and unknown to the Grand Jury. **SHAWN YOUNG** would also engage in communication with lenders about these applications and electronically sign documents as **TRENIKIA BANKS** and other co-conspirators. To make the lenders believe they were communicating with the owners of the businesses themselves:

a.    Defendant **TRENIKIA BANKS** and other co-conspirators would provide information and documents to Defendant **SHAWN YOUNG** for him to submit to the lenders; and

b.    Defendant **SHAWN YOUNG** would create email addresses to use in correspondence with the lenders, which would bear the name of the business or the owner of the business in question.

33.    It was part of the scheme that Defendant **SHAWN YOUNG** would receive and retain a portion (between 35-75%) of PPP and EIDL loan funds approved and funded to businesses belonging to Defendant **TRENIKIA BANKS** and to other co-conspirators known and unknown to the Grand Jury.

34.    It was part of the scheme that Defendants **SHAWN YOUNG, TRENIKIA BANKS**, and other co-conspirators known and unknown to the Grand Jury used PPP and EIDL loan funds to make large cash withdrawals and to pay for unauthorized and non-business expenses, including but not limited to residential mortgages, home improvement loans, the purchase of vehicles, and kickback payments to **SHAWN YOUNG**.

35.    It was part of the scheme that Defendants **SHAWN YOUNG, TRENIKIA BANKS**, and other co-conspirators known and unknown to the Grand Jury submitted and caused

10

to be submitted applications for forgiveness of their PPP loans which falsely stated that the PPP loan funds had been used only for authorized business purposes.

### ***Overt Acts***

**EIDL Applications to SBA**

#### YOUNG's Business Entities

36.     Between April 12, 2020, and April 14, 2020, **YOUNG** submitted through the SBA website EIDL applications for SQ Trucking, SQ Janitorial, and ADMC. The SBA did not approve EIDL loans for SQ Trucking, SQ Janitorial, or ADMC.

#### The Exclusive Estates LLC

37.     On or about May 9, 2020, **YOUNG** texted to **BANKS**: "Send me your Bussiness [sic] info ASAP" and "We can get some money." In response, **BANKS** texted **YOUNG** an image of the Texas Secretary of State Certificate of Filing for The Exclusive Estates LLC.

38.     On or about May 9, 2020, **YOUNG** submitted through the SBA website an EIDL application for The Exclusive Estates LLC. The application listed the applicant name of "Trenikia Banks." The application falsely stated that The Exclusive Estates LLC had 35 employees as of January 31, 2020.

39.     The SBA approved The Exclusive Estates LLC for an EIDL loan in the amount of $150,000. On or about May 12, 2020, **YOUNG** texted **BANKS** that the loan had been approved, but **YOUNG** falsely stated that the loan amount was only $30,000. **YOUNG** promised to "give u 20k and keep 10k."

40.     On or about May 13, 2020, **YOUNG** electronically signed the Promissory Note for the loan using the name "Trenikia Banks."

11

41.     The Exclusive Estates EIDL application requested payment be disbursed into a bank account belonging to **YOUNG**. The bank account was modified prior to payment. On or about May 14, 2020, the SBA disbursed $149,900 to Woodforest Bank Account x3352 (ADMC), which had a balance of approximately $1,300. Between May 15, 2020, and May 18, 2020, **YOUNG** withdrew from the account a combined $63,000 in three separate cash withdrawals.

<u>Solid LLC</u>

42.     On or about May 12, 2020, **YOUNG** texted **BANKS** to send him the information for her "other company" in order for him to "do an app to see what we can get thru the SBA again." **YOUNG** texted "[n]o more struggling for u we getting this $$$ lol." **BANKS** responded "[for real for real]…I'm using this to really start my business…" On or about May 13, 2020, **BANKS** texted **YOUNG** the name and EIN of Solid LLC.

43.     On or about May 13, 2020, **YOUNG** submitted through the SBA website an EIDL application for Solid LLC. The application listed the applicant name of "Trenikia Banks." The application falsely stated that Solid LLC had 28 employees as of January 31, 2020.

44.     The SBA approved Solid LLC for an EIDL loan in the amount of $150,000. On or about May 19, 2020, **YOUNG** texted **BANKS** that the loan had been "pre-approved," but **YOUNG** falsely stated that the loan amount was only $25,000. YOUNG promised to "give u 15k this time and . . . keep 10k."

45.     On or about June 14, 2020, **YOUNG** electronically signed the Promissory Note for the loan using the name "Trenikia Banks."

46.     The Solid LLC EIDL application requested payment into Woodforest Bank Account x2941 (SQ Janitorial), a bank account belonging to **YOUNG**. On or about June 16, 2020, the SBA disbursed $149,900 to Account x2941, which had a balance of approximately $570. Also

on or about June 16, 2020, **YOUNG** initiated a $100,000 wire transfer from Account x2941 to Snap Lending LLC, which held the primary mortgage on **YOUNG**'s and Person B's residence at 26 La Serra Path in Missouri City. **YOUNG** also withdrew $15,000 in cash.

47.     On or about June 16, 2020, **YOUNG** texted BANKS that "the $$$ hit the bank account" but he falsely stated that the SBA had "reduced the loan by 5k" from the purported $25,000 loan amount he had previously misrepresented to her. **YOUNG** stated he would give her $10,000 of the loan funds rather than the $15,000 he had previously promised. **BANKS** asked why the loan amount had been reduced. **BANKS** explained: "I'm just asking so when things are legit I understand…"

Impressionable Memories LLC

48.     On or about June 16, 2020, **YOUNG** texted to **BANKS** that he was "working on another so it should be another 10-15k soon again." **YOUNG** instructed **BANKS** to "[s]end me info on impressions company."

49.     On or about June 17, 2020, **YOUNG** submitted through the SBA website an EIDL application for Impressionable Memories LLC. The application listed the applicant name of "Trenikia Banks." The application falsely stated that Impressionable Memories LLC had 35 employees as of January 31, 2020. The SBA did not approve an EIDL loan for Impressionable Memories LLC.

**PPP Applications to Allegiance Bank**

SQ Trucking – First Draw

50.     On or about April 14, 2020, **YOUNG** submitted to Allegiance Bank a first draw PPP application for SQ Trucking. **YOUNG** falsely represented that SQ Trucking had 25 employees and an average monthly payroll of tens of thousands of dollars. **YOUNG** submitted in

13

support of the application fraudulent business tax returns for SQ Trucking purportedly signed by tax preparer Person A. Allegiance Bank approved a first draw PPP loan to SQ Trucking in the amount of $16,735, which was less than the loan amount requested by **YOUNG**.

ADMC – First Draw

51.    On or about May 6, 2020, **YOUNG** submitted to Allegiance Bank a first draw PPP application for ADMC. **YOUNG** falsely represented that ADMC had 10 employees and an average monthly payroll of tens of thousands of dollars. Attached in support of the application were fraudulent business tax returns for ADMC purportedly signed by tax preparer Person A.

52.    Allegiance Bank approved a first draw PPP loan to ADMC in the amount of $88,540. The loan funds were disbursed into Allegiance Bank x1389 (ADMC) on or about May 13, 2020. Between on or about May 14 and on or about May 18, 2020, **YOUNG** made five cash withdrawals from the account totaling $87,000.

SQ Janitorial – First Draw

53.    On or about April 30, 2020, **YOUNG** submitted to Allegiance Bank a first draw PPP application for SQ Janitorial. **YOUNG** falsely represented that SQ Janitorial had 20 employees and an average monthly payroll of tens of thousands of dollars. **YOUNG** submitted in support of the application fraudulent business tax returns for SQ Janitorial purportedly signed by tax preparer Person A. Allegiance Bank did not approve a first draw PPP loan for SQ Janitorial.

**PPP Applications to Cache Valley Bank**

SQ Janitorial – First Draw

54.    On or about July 3, 2020, **YOUNG** submitted to Cache Valley Bank, through the online loan marketplace Lendio, a first draw PPP application for SQ Janitorial. **YOUNG** falsely represented that SQ Janitorial had 25 employees and an average monthly payroll of tens of

14

thousands of dollars. **YOUNG** submitted in support of the first draw PPP application fraudulent business tax returns for SQ Janitorial purportedly signed by tax preparer Person A.

55.    Cache Valley Bank approved a first draw PPP loan to SQ Janitorial in the amount of $135,000. The loan funds were disbursed into Woodforest Bank Account x2941 (SQ Janitorial) on or about August 11, 2020. On or about August 12, 2020, **YOUNG** withdrew $100,000 in cash from the account.

### ADMC – Second Draw

56.    On or about January 11, 2021, **YOUNG** submitted to Cache Valley Bank a second draw PPP application for ADMC. **YOUNG** falsely represented that ADMC had 10 employees and an average monthly payroll of tens of thousands of dollars. **S**ubmitted in support of the second draw PPP application were fraudulent business tax returns for ADMC purportedly signed by tax preparer Person A.

57.    Cache Valley Bank approved a second draw PPP loan to ADMC in the amount of $88,540. On or about March 1, 2021, Cache Valley Bank disbursed the second draw PPP loan funds for ADMC into Hancock Whitney Bank Account x3463 (ADMC). On or about March 1, 2021, **YOUNG** withdrew $25,000 from the account in cash. On or about March 2, 2021, **YOUNG** authorized a $57,000 ACH payment from the account to EnerBank USA. This payment satisfied most of the remaining balance on a home improvement loan taken out in 2019 by Person B for the installation of a swimming pool. Person B and **YOUNG** lived together at 26 La Serra Path in Missouri City, Texas.

### SQ Janitorial – Second Draw

58.    On or about January 11, 2021, **YOUNG** submitted to Cache Valley Bank a second draw PPP application for SQ Janitorial. **YOUNG** falsely represented that SQ Janitorial had 20

employees and an average monthly payroll of tens of thousands of dollars. Submitted in support of the second draw PPP application were fraudulent business tax returns for SQ Janitorial purportedly signed by tax preparer Person A. Cache Valley did not approve a second draw PPP loan for SQ Janitorial.

SQ Trucking – Second Draw

59.    On or about January 11, 2021, **YOUNG** submitted to Cache Valley Bank a second draw PPP application for SQ Trucking. **YOUNG** falsely represented that SQ Trucking had 25 employees and an average monthly payroll of tens of thousands of dollars. Submitted in support of the second draw PPP application were fraudulent business tax returns for SQ Trucking purportedly signed by tax preparer Person A. One of the returns was a Form 940, Employer's Annual Federal Unemployment Tax Return, for 2019. **YOUNG** had submitted a different Form 940 for 2019 to Allegiance Bank in support of SQ Trucking's first draw PPP application. Cache Valley did not approve a second draw PPP loan for SQ Trucking.

The Exclusive Estates LLC – First Draw

60.    On or about January 10, 2021, **YOUNG** texted **BANKS** a pdf document from Cache Valley Bank with instructions for documentation on PPP loans. **YOUNG** wrote: "This is what's required for ppp that I would have to create[.]"

61.    On or about January 14, 2021, **YOUNG** texted **BANKS** to "[g]et your stuff together for exclusive estates so I can submit." **YOUNG** also texted: "Need to show your Bussiness [sic] is in good standing with state showing active and not forfeited." When **BANKS** responded by texting an image file reflecting that the entity was in tax forfeiture status, **YOUNG** texted: "Ok get it back active." **YOUNG** stated: "can't do nothing till your company back active."

16

62.     On or about February 19, 2021, **BANKS** submitted the paperwork necessary to return The Exclusive Estates LLC to active status with the Texas Secretary of State. On or about February 27, 2021, Cache Valley Bank received a first draw PPP application for The Exclusive Estates LLC. The application falsely represented that the business had 12 employees and an average monthly payroll of tens of thousands of dollars. Submitted in support of the application were fraudulent business tax returns for The Exclusive Estates LLC purportedly signed by tax preparer Person A. Cache Valley Bank did not approve a PPP loan for The Exclusive Estates LLC.

<u>Impressionable Memories LLC – First Draw</u>

63.     On or about January 21, 2021, **YOUNG** texted **BANKS** an image file depicting a first draw PPP application for Impressionable Memories LLC. **YOUNG** texted: "121k is what on app so u know and u have 12 employees." **BANKS** responded with the email address: "Applications@CVB.com."

64.     On or about January 21, 2021, Cache Valley Bank received a first draw PPP application for Impressionable Memories LLC. The application falsely represented that Impressionable Memories LLC had 12 employees and an average monthly payroll of tens of thousands of dollars. Submitted in support of the application was a fraudulent business tax return for Impressionable Memories LLC purportedly signed by tax preparer Person A.

65.     Cache Valley Bank approved a first draw PPP loan to Impressionable Memories LLC in the amount of $121,250. **YOUNG** electronically signed the Promissory Note in the name of "Trenikia L. Banks" on or about February 25, 2021.

66.     On or about February 26, 2021, **YOUNG** texted **BANKS** an image file depicting a portion of the Promissory Note for the first draw PPP loan to Impressionable Memories LLC. **BANKS** asked: "What's that promise to pay tho?" **YOUNG** responded: "Don't worry bout that u

don't have to pay back if paperwork is put in to be forgiven but if u don't then it's a 1 percent loan. I have papers to put in once that time comes up a year from now."

67.    Cache Valley Bank disbursed the first draw PPP loan funds for Impressionable Memories LLC into Capital One Bank Account x0546 (BANKS dba Impressionable Memories) on or about March 1, 2021. On or about March 2, 2021, **BANKS** used the loan proceeds to purchase a $48,500 cashier's check made payable to "ADMC Ent." On or about March 2, 2021, the $48,500 cashier's check from **BANKS** was deposited into Allegiance Bank Account x1389 (ADMC), a bank account belonging to **YOUNG**.

**PPP Application to Hancock Whitney Bank**

SQ Trucking – Second Draw

68.    On or about May 20, 2021, **YOUNG** electronically submitted to Hancock Whitney Bank a second draw PPP application for SQ Trucking. **YOUNG** falsely represented that SQ Trucking had 25 employees and an average monthly payroll of tens of thousands of dollars.

69.    Hancock Whitney Bank approved a second draw PPP loan to SQ Trucking in the amount of $124,695. On or about May 20, 2021, the loan funds were disbursed into Hancock Whitney Account x3447 (SQ Trucking). On or about May 21, 2021, **YOUNG** wrote and negotiated from the account a $25,000 check payable to "Shawn Young." He also purchased a $99,698.38 cashier's check made payable to SQ Trucking, which he then used to open an account at Prosperity Bank.

**COUNTS TWO THROUGH NINE**
**(Wire Fraud)**

70.    The Grand Jury re-alleges paragraphs 1 through 69 of this Indictment.

71.    On or about the dates listed below, in the Southern District of Texas and elsewhere, the following defendants, with the intent to defraud, for the purpose of executing and attempting

to execute the above-described scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted in interstate commerce the wire communications identified below.

| Count | Defendant(s) | Date | Wire Communication |
|-------|--------------|------|--------------------|
| 2 | **YOUNG** | April 14, 2020 | Electronic submission of SQ Trucking's first draw PPP application (Allegiance Bank), sent interstate to a server of DocuSign |
| 3 | **YOUNG** | May 6, 2020 | Electronic submission of ADMC's first draw PPP application (Allegiance Bank), sent interstate to a server of DocuSign |
| 4 | **YOUNG BANKS** | May 9, 2020 | Electronic submission of EIDL application for The Exclusive Estates LLC, sent interstate to a server of the SBA |
| 5 | **YOUNG BANKS** | May 13, 2020 | Electronic submission of EIDL application for Solid LLC, sent interstate to a server of the SBA |
| 6 | **YOUNG** | August 10, 2020 | Electronic submission of signed Promissory Note for SQ Janitorial's first draw PPP loan in the amount of $135,000 (Cache Valley Bank), sent interstate to a server of ProSign |
| 7 | **YOUNG** | February 24, 2021 | Electronic submission of signed Promissory Note for ADMC's second draw PPP loan in the amount of $88,540 (Cache Valley Bank), sent interstate to a server of ProSign |
| 8 | **YOUNG BANKS** | February 25, 2021 | Electronic submission of signed Promissory Note for Impressionable Memories LLC's first draw PPP loan in the amount of $121,250 (Cache Valley Bank), sent interstate to a server of ProSign |
| 9 | **YOUNG** | May 20, 2021 | Electronic submission of SQ Trucking's second draw PPP application (Hancock Whitney Bank), sent interstate to a server of DocuSign |

**All in violation of Title 18, United States Code, Section 1343 and 2.**

19

## COUNTS TEN THROUGH ELEVEN
### (Monetary Transactions in Criminally Derived Property)

72.    The Grand Jury re-alleges paragraphs 1 through 71 of this Indictment.

73.    On or about the dates identified below, within the Southern District of Texas and elsewhere, the defendants identified below, did knowingly engage in monetary transactions affecting interstate commerce, in criminally derived property of a value greater than $10,000.00, that is, the monetary transactions identified below, such property having been in fact derived from wire fraud in violation of 18 U.S.C. § 1343.

| Count | Defendant(s) | Date | Monetary Transaction |
|-------|--------------|------|---------------------|
| 10 | **YOUNG** | June 16, 2020 | $100,000 wire transfer from Woodforest Bank Account x2941 (SQ Janitorial) to Prosperity Bank x2094 (Snap Lending LLC) |
| 11 | **YOUNG BANKS** | March 2, 2021 | Deposit of $48,500 cashier's check into Allegiance Bank Account x1389 (ADMC) |

**All in violation of Title 18, United States Code, Section 1957 and 2.**

### NOTICE OF FORFEITURE
### (18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c))

74.    Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the United States gives notice to defendants that in the event of their conviction of any of the offenses charged in Counts One through Nine of this Indictment, all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses, is subject to forfeiture.

### NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(1))

75.    Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to defendants that in the event of their conviction of either of the offenses charged in Counts

Ten through Eleven of this Indictment, all property, real or personal, involved in money laundering offenses or traceable to such property, is subject to forfeiture.

### *Property Subject to Forfeiture*

76.    The property subject to forfeiture includes, but is not limited to, the following:

a.    The real property, including all improvements and appurtenances, located at 26 La Serra Path, Missouri City, Texas 77459, and legally described as:

LOT 19, BLOCK 1, SIENNA VILLAGE OF BEES CREEK SECTION TWENTY-SEVEN (27), ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN PLAT NUMBER 20130195, PLAT RECORDS, FORT BEND COUNTY, TEXAS

b.    2019 Honda Accord, VIN # 1HGCV2F39KA034125

### *Money Judgment and Substitution Assets*

77.    Defendants are notified that upon conviction, the United States will seek a money judgment against each defendant. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exist, the United States will seek to forfeit any other property of the defendants up to the amount of the money judgment against that defendant.

A True Bill:

## Original Signature on File

Grand Jury Foreperson

ALAMDAR S. HAMDANI
United States Attorney

By: _____
Stephanie Bauman
Shirin Hakimzadeh
Assistant United States Attorneys
713-567-9000